IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> CHRISTIAN DAVID BURCH, <br><br> Defendant. | No. 3:23-mj-00375-MMS |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Katie Yarborough, Special Agent with the FBI, being duly sworn, depose and state that:

I. **BACKGROUND AND EXPERIENCE OF AFFIANT**

1. I have been a Special Agent with the FBI for approximately four years. I am currently assigned to the Violent Crime squad in the FBI Anchorage Field Office. During my four years with the FBI, I have led and participated in many investigations involving violent crimes, threats, robbery, fraud, and drugs. I also investigate violations of federal law occurring in the Special Aircraft Jurisdiction of the United States.

II. **PURPOSE OF AFFIDAVIT**

2. I make this affidavit in support of an application for a criminal complaint against CHRISTIAN DAVID BURCH. I submit that there is probable cause to believe that BURCH has committed violations of 49 U.S.C. § 46504 (Interference with Flight Crew Members and Attendants), 49 U.S.C. § 46506(1) (Application of Certain Criminal Laws to

Acts on Aircraft), and 18 U.S.C. § 113(a)(5) (Simple Assault within Maritime and Territorial Jurisdiction). I have not set forth in this affidavit all the facts and sources of information with which I am familiar that support my assertion of probable cause.

### III. RELEVANT STATUTES AND REGULATIONS

3. Title 49, United States Code, Section 46504 (Interference with Flight Crew Members and Attendants) provides in pertinent part:

   a. "An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or conspires to do such an act, shall be fined under title 18, imprisoned for not more than 20 years, or both."

4. Title 49, United States Code, Section 46506(1) (Application of Certain Criminal Laws to Acts on Aircraft), provides:

   a. "An individual on an aircraft in the special aircraft jurisdiction of the United States who commits an act that – (1) if committed in the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18) would violate section 113, 114, 661, 662, 1111, 1112, 1113, or 2111 or chapter 109A of title 18, shall be fined under title 18, imprisoned under that section or chapter, or both[.]"

5. Title 18, United States Code, Section 113(a)(5) (Simple Assault within Maritime and Territorial Jurisdiction), provides:

    a. "Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: (5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both."

### IV. PROBABLE CAUSE

6. At approximately 10:20 a.m., the FBI Operations Center in the Anchorage Field Office received a call from Anchorage Airport Police Department (AAPD) Dispatch in reference to a disturbance on board Alaska Airlines Flight 183 from Minneapolis, Minnesota to Anchorage, Alaska. The immediately available information was that a passenger on board the plane was being disruptive or hostile towards the flight crew and had been restrained and sedated. There were also indications that the passenger may have been under the influence of medication or alcohol.

7. The flight landed in Anchorage at approximately 11:00 a.m. local time. I responded to the airport and met with the AAPD Watch Commander, who brought me to the gate of the arriving flight. AAPD and I boarded the plane. We learned the incident had primarily occurred in the first-class section of the plane, so an announcement to the first-

class passengers was made allowing them to exit the plane, where an Officer with AAPD distributed AAPD Witness Statement Forms to them to fill out.

8. The suspect, identified as CHRISTIAN DAVID BURCH, 37, was removed from the plane and taken to a holding room in the AAPD office at the airport. I observed that BURCH was handcuffed at the time we boarded the plane. After BURCH was taken into custody, the rest of the passengers deboarded the plane.

9. An Officer with AAPD and I interviewed all four of the flight attendants onboard the plane in a secluded hallway beside the gate. I recorded these interviews. One of the attendants was assigned to the first-class section, while the other three were assigned to the rest of the plane.

10. One of the flight attendants stated at approximately 2 ½ hours into the flight she heard a scream coming from the lavatory in the back of the plane. She went to the lavatory door and asked if the person inside needed help. There was no response. She then heard another scream coming from the person inside the lavatory. Suddenly, the male inside, later identified as BURCH, punched the door open. When it opened, the flight attendant immediately smelled a strong odor she did not recognize. She later described it as an old, burnt, metallic smell. The male stated angrily he could not figure out how to unlock the door. The flight attendant described BURCH as having an angry demeanor and a "puffed-up" stance and had drool and foam coming out of his mouth.

11. BURCH started walking quickly towards the front of the plane awkwardly and stumbling and was not bending his knees as he walked. The flight attendant noted it

was when he walked past his seat to continue toward the front of the plane that she thought this was odd and proceeded to walk upfront and follow him.

12. The first-class flight attendant stated he blocked BURCH's path before he reached the cockpit. He said it appeared BURCH might have been intoxicated. He asked BURCH what he was doing up at the front. BURCH replied with stating he could not find his seat. The first-class flight attendant thought he saw BURCH possibly twitch and considered he might be having a medical issue, so he had BURCH sit down on the jump seat located at the front of the plane at the flight deck. The flight attendant then made an announcement asking if there was a nurse or a doctor onboard. A female passenger indicated she was a registered nurse. She got up from her seat and went over to BURCH. After assessing BURCH, she stated he needed to receive Narcan (which I know to be a medication used to reverse or reduce the effects of opioid overdoses). The flight crew went to the back of the plane to retrieve the Narcan. By this point, BURCH had become combative, and the flight attendants were trying to hold BURCH down.

13. The registered nurse attempted to administer the Narcan to BURCH, but BURCH resisted and became combative. He began fighting back and appeared to bite his lip, causing bleeding from his mouth. The flight crew told BURCH to calm down. BURCH tried to punch and push on people and grab onto them. Three male passengers got up from their seats and came up to the front of the plane to assist. The registered nurse told the flight crew they needed to restrain BURCH while she administered the Narcan.

D20230625

14. In my interviews, the flight attendants stated they felt they had to restrain BURCH for passenger safety, as well as their own, and they did not believe they would have been able to gain control over him without doing so. They further stated BURCH continued fighting back even after he was handcuffed behind his back.

15. The registered nurse was eventually able to intranasally administer two doses of Narcan, but in amounts of only 1 milligram per dose. I am aware that Narcan is generally administered in 6 to 8 milligram doses to be effective. BURCH was bleeding from his nose by this time, which appeared to be caused by the administration of the Narcan, as the flight attendants did not observe him bleeding when he left the lavatory. BURCH'S blood got on several of the flight attendants and passengers who were restraining him, including in one passenger's mouth. After BURCH was restrained, two of the flight attendants changed into civilian clothing because they did not want the passengers to be alarmed by the bloodstains on their uniforms.

16. During the struggle, one of the flight attendants suffered minor injuries including scratches to her neck and hands. She stated that at one point, BURCH reached up in a chokehold motion with his hand and pushed against her neck.

17. As the flight crew and passengers attempted to restrain BURCH, a flight attendant saw a small piece of foil in his pocket, with a white powdery substance coming out. She stated it smelled the same as what she had smelled earlier emanated from the lavatory immediately after BURCH punched open the door. The nurse, who also saw the foil coming out of BURCH's pocket, retrieved the foil and opened it, where she saw a

white powdery substance. She folded the foil to close it and placed it back in BURCH's pocket.

18. During their interviews, the flight attendants stated BURCH's behavior forced them to stop performing their normal duties as flight attendants. One of them in the back of the plane had to assist the first-class flight attendant with their duties as the first-class flight attendant had to stay by the aircraft phone to stay in contact with the pilots for updates. They emphasized that they feared for their safety due to BURCH's behavior and actions.

19. During the interview of a male witness passenger who assisted with holding BURCH and volunteering to sit beside him at a different row the flight attendant had made available, the witness stated BURCH seemed calmer after being given the Narcan and sedation medication. At this point, there were approximately two hours left before the plane landed in Anchorage. BURCH did not speak the rest of the flight to the witness sitting next to him except to say, this was not an overdose that he was "just having a panic attack."

20. The male passenger who was seated next to BURCH stated that BURCH did not smell of alcohol and did not appear to be high when he boarded the plane. The passenger confirmed in his statement that it took six people to hold BURCH down. He was sprayed with blood, including on his hands and in his mouth.

21. At one point during the descent or immediately after landing, BURCH, while still handcuffed with his hands behind his back, pulled a piece of foil out of his pocket and tried to stuff it between the seats in an apparent attempt to hide it. The male passenger

seated next to BURCH loudly asked him what he was doing. The flight attendants heard the passenger's question. They went to where BURCH was sitting and saw the foil stuffed between the seats. AAPD retrieved the foil from where BURCH hid it.

22. After interviewing the flight crew and witnesses, we responded to the AAPD office, where BURCH was read his *Miranda* rights and interviewed him. BURCH waived his *Miranda* rights and agreed to speak with us. This interview was also recorded.

23. BURCH stated he was traveling to Homer with his stepson. When he went to the bathroom on the plane, he began to experience vertigo. He denied consuming any alcohol or medication or having any medical issues. He said he remembered lying down and waking up with people on top of him, trying to shove a syringe up his nose. He said he did not know why people were on him and tried to push them off.

24. BURCH eventually stated he took three gummy bears before boarding the plane that he bought at a gas station in Minnesota and claimed that he had a bad reaction to them. I asked if the gummy bears were laced with anything such as marijuana. He said that they contained HHC (an acronym with which I was not familiar with at the time, but which I subsequently confirmed refers to hexahydrocannabinoil, a psychoactive substance similar to THC). The AAPD officer present asked him where he bought them from. BURCH said he could not remember. He said he had not had marijuana in at least a year and a half. I asked if he had ever had a reaction like this before; he said no.

25. BURCH was asked about the strong odor emanating from the bathroom when he punched open the door. He said he did not know what the smell was. I asked him if he

took anything in the bathroom that would produce such a smell. He said no. I asked him about the piece of foil in his pocket with the white powdery substance that was seen when he came out of the bathroom and again later when he was lying on the floor at the front of the plane. He acknowledged having the foil but denied that there was any white powdery substance in the foil. He was unable to provide any explanation for why he had foil in his pocket.

26. BURCH made a series of inconsistent and contradictory statements regarding the foil. At this point, I advised BURCH that it was a crime to lie to a federal officer in an investigation. He indicated that he understood. I asked him again why there was foil in his pocket. He again replied that he did not know. BURCH was silent for several minutes. He was not making eye contact by this point and was looking at the ground. His eyes appeared to be red and watery, as if he was tearing up.

27. After questioning BURCH, the AAPD officer and I left the room. The AAPD officer shortly after went back into the room and asked BURCH for consent to search the draw-string bag he had with him as a carry-on to retrieve his wallet. BURCH gave verbal consent to open the draw-string bag. The AAPD officer put the draw-string bag on the table and had BURCH open the bag and remove the wallet. When he did so, a piece of wadded up foil fell out of the bag onto the table. At that point, BURCH quickly grabbed some pants from inside the bag and tried to put them on top of the foil to conceal it. After emptying the bag and retrieving the wallet, the AAPD officer retrieved BURCH's driver's license from the wallet. The AAPD officer told BURCH to sit back down, not get up, and not touch

anything on the table. The AAPD officer then left the room. Surveillance cameras inside the room showed that once the officer left, BURCH stood up, went to the table, and made as if to grab something. The AAPD officer then reentered the room. She saw BURCH turned sideways grabbing something off the table. When he saw her, he threw it underneath the table. The officer noticed the same foil that had come from the bag and was previously under the pants on the table, was now under the table. The officer recovered the foil from where BURCH tried to hide it under the table.

28. I then arrested BURCH and transported him to the Anchorage Correctional Complex (ACC). The draw-string bag and contents were left in a secure area with AAPD. Shortly after transport, a Task Force Officer with AAPD swabbed both the interior and exterior of the draw-string bag. Utilizing the Ion Scan 600, an electronic device that detects trace amounts of controlled substances, BURCH's bag alarmed for the presence of both heroin and carfentanyl.

29. The foil that BURCH tried to stuff between the seats of the plane, as well as the foil that fell out of the draw-string bag, were also field tested. Neither one alarmed for the presence of controlled substances.

30. During the routine medical examination at booking with ACC, BURCH stated that he had no medical issues (such as epilepsy), was taking no prescriptions, and had not consumed any alcohol.

//

//



## V. CONCLUSION

31. Based on the foregoing, I submit that there is probable cause to believe that CHRISTIAN DAVID BURCH, assaulted or intimidated a flight crew member or flight attendant, interfered with the performance of the duties of the member or attendant or lessened the ability of the member or attendant to perform those duties, or attempted or conspired to do such an act, while onboard an aircraft in the special aircraft jurisdiction of the United States, in violation of 49 U.S.C. § 46504 (Interference with Flight Crew Members and Attendants); that he committed an act that if committed in the special maritime and territorial jurisdiction of the United States would violate section 113 of Title 18 while onboard an aircraft in the special aircraft jurisdiction of the United States, in violation of 49 U.S.C. § 46506(1) (Application of Certain Criminal Laws to Acts on Aircraft); and that he committed a simple assault within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(5) (Simple Assault within Maritime and Territorial Jurisdiction).

Respectfully submitted,

_____
Katie Yarborough
Special Agent, FBI

Subscribed digitally and sworn to telephonically on June 26, 2023.

_____
HON. MATTHEW M. S
CHIEF UNITED STATES MAGISTRATE JUDGE

*U.S. v. Christian David Burch*
3:23-mj-00375-MMS